

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00334-CR

OGDEN JAMES                                             APPELLANT

V.

THE STATE OF TEXAS                                         STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

Appellant Ogden James appeals his conviction for assault–family violence. In two issues, James argues that the trial court erred by admitting a police officer's improper expert opinion testimony and by prohibiting him from questioning the complainant about a prior incident in which she allegedly attacked him. We will affirm.

## II. Factual and Procedural Background

Ogden James and Maggie Bryan had a dating relationship and lived together.  On March 20, 2009, Maggie was sitting on her porch when James, who was mad that he had to move out, kicked her in her back.  Maggie fell off the porch and struggled to prevent James from hitting her.

At about 10:15 p.m. that night, Officer Jamie Fletcher responded to a domestic disturbance call at Maggie's residence.  James was standing in the front yard when Officer Fletcher arrived.  He told Officer Fletcher that Maggie had accused him of sleeping with another woman and had attacked him.  Officer Fletcher noticed that James had a couple of scratches on his face.  She went inside and found Maggie, who was "kind of shaking" and had been crying.  Maggie told Officer Fletcher that James had assaulted her; she said James had choked her, and she pointed out a small cut on her leg and a mark on one of her arms where she said James had grabbed her.[1]  Officer Fletcher noticed that both James and Maggie had been drinking and that Maggie was more intoxicated than James, but that both were at the "lower end" of the intoxication scale.  Concluding that both James and Maggie were "aggressors" in the incident and that neither one had injuries that were any worse than the other's injuries, Officer Fletcher decided not to arrest either one but to try to separate them to prevent

---

[1]Maggie agreed that she may have told the police or 911 that she had scratched James's face when she was trying to keep him from hitting her.

2

any further arguments or violence.[2]  James agreed to leave, and Officer Fletcher advised him that "if you come back and something happens and there's another altercation, somebody is going to go to jail."  Maggie went to bed.

Sometime later that night, James burst through Maggie's front door and attacked her, hitting her multiple times on her face and head with his fist. Terrified, Maggie tried to call 911 in the midst of the assault.

At about 1:42 a.m., Officer Fletcher received a second call regarding Maggie's residence and was the first officer to respond.  She approached the house and heard yelling, screaming, and "banging around" from inside; it sounded to Officer Fletcher like someone or something was getting thrown around.  After backup arrived, Officer Fletcher knocked on the door.  Maggie opened the door with James right behind her.  Officer Fletcher observed that Maggie was under the strain of some kind of trauma that she had just experienced and that she looked different than she did earlier in the evening when Officer Fletcher responded to the first call; her face was covered in blood, her left eye was "completely bruised and swollen shut," she had blood coming out of her eye, and she had a cut on her swollen face.  Crying and very upset, Maggie told Officer Fletcher, "he did this to me," which Officer Fletcher interpreted to be in reference to James.  Officer Fletcher called an ambulance that transported Maggie to the hospital.  Maggie's injuries included a one-inch

_____

[2]Officer Fletcher described the confrontation as "mutual combat"; "they both had fault."

3

laceration under her left eye and multiple bruises and abrasions all over her body and face.

James told Officer Fletcher that Maggie had called or texted him to come back to the house after he had left, that he was worried she would do something to his property, that she attacked him when he returned, and that he had acted in self-defense. Officer Fletcher examined James for new injuries, but she did not notice that he had suffered any injuries that he did not have when she saw him during the first call earlier in the evening. Officer Fletcher arrested James, and her backup officer took him to jail.

A jury convicted James of assault–family violence and sentenced him to twenty years' confinement. James appeals.

### III. OBJECTIONS TO OFFICER FLETCHER'S TESTIMONY

### A.    Testimony About Maggie's Condition

In the first of two arguments James raises in his first issue, he contends that the trial court abused its discretion by permitting Officer Fletcher to explain that she called an ambulance for Maggie because Maggie had the "crap" beat out of her. The following exchange occurred at trial:

> Q.   And tell me why you did that. Why did you call for an ambulance?
>
> A.   Because she had just had the crap beat out of her and she needed immediate medical attention.
>
> [Defense Counsel]:   Objection, Your Honor. She testified she thought she needed medical attention, but "he beat the crap out of her" is speculation on her part. It's a characterization.

4

THE WITNESS: I used to be an EMT, so I do have medical training.

THE COURT: What is your legal objection?

[Defense Counsel]: Asking for a ruling on the objection. I believe it's a statement of opinion on her part, and also, it's something she's not qualified to testify to. She can state that she thought she needed medical attention; I don't have a problem with that. But she called the medic.

THE COURT: Overruled.

James argues that Officer Fletcher's testimony that Maggie "had just had the crap beat out of her and she needed immediate medical attention" (1) was an improper causation or medical opinion because "there were no qualifications given by Officer Fletcher prior to her opinion that [James] beat the 'crap' out of the victim" and (2) amounted to a legal conclusion because it "dealt with the ultimate issue of whether [James] assaulted the alleged victim."

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App.), *cert. denied*, 549 U.S. 1056 (2006); *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1991) (op. on reh'g). We reverse only when the trial court's decision was so clearly wrong as to fall outside the zone of reasonable disagreement. *See Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). We uphold the trial court's ruling if it is reasonably supported by the record and correct under any theory of law applicable to the case. *See Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

5

Rule 701 covers the testimony of a "traditional" witness—one who personally witnessed or participated in the events about which he is testifying. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006) (citing *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002)). It provides that such a "witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Tex. R. Evid. 701; *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004). The requirement that an opinion be rationally based on the perception of the witness is composed of two parts: (1) the witness must establish personal knowledge of the events from which his opinion is drawn and (2) the opinion drawn must be rationally based on that knowledge. *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997); *Scott v. State*, 222 S.W.3d 820, 828 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

In this case, Officer Fletcher testified that she responded to two separate disturbance calls at Maggie's residence. At the first call, Maggie told Officer Fletcher that James had assaulted her; she said that James had choked her, and she pointed out a small cut on her leg and a mark on one of her arms where she said James had grabbed her. Officer Fletcher observed that Maggie was "kind of shaking" and had been crying.

At the second call, before knocking on the front door, Officer Fletcher heard yelling, screaming, and "banging around" from inside Maggie's house.

6

She testified that it sounded like someone or something was getting thrown around. When Maggie opened the front door, Officer Fletcher observed that Maggie looked different than she did at the first call—her face was covered in blood, her left eye was "completely bruised and swollen shut," she had blood coming out of her eye, and she had a cut on her swollen face. Maggie was also crying and very upset, and she told Officer Fletcher, "he did this to me." Officer Fletcher interpreted Maggie's statement to be in reference to James, who was the only other person there.

Officer Fletcher's opinion that Maggie "had just had the crap beat out of her" was thus based on and derived from her cumulative personal knowledge that James and Maggie had a physical altercation earlier in the evening; that she heard yelling, screaming, and "banging around" from inside Maggie's house; that Maggie answered the door with a swollen, bloody face and a swollen, shut eye that she did not have at the first call; and that Maggie told her that James "did this." *See Fairow*, 943 S.W.2d at 898. Based on her personal knowledge of these facts, her opinion was also rational. *See id.* Accordingly, Officer Fletcher's opinion that Maggie "had just had the crap beat out of her" was rationally based on events that she personally perceived during the calls at Maggie's residence and, therefore, met rule 701's criteria that opinion testimony by a lay witness be based on events that the witness personally perceived. *See* Tex. R. Evid. 701.

7

Regarding rule 701's other requirement, Officer Fletcher's opinion was helpful to the determination of a fact in issue in the case: whether James assaulted Maggie. *See id.*

The dissent opines that Officer Fletcher "had no personal knowledge of what had caused Maggie's injuries" and that she "was not stating an opinion. She was stating, as a fact, her guess." Dissenting and concurring op. at 4–5. Besides ignoring the plethora of undisputed facts demonstrating that Officer Fletcher's responsive lay opinion was rationally based on events that she personally perceived during both visits to Maggie's residence, the dissent's characterization of Officer Fletcher's testimony as merely a "guess" necessarily carries with it the unlikely factual (and unlikely logical) deduction that Maggie inflicted her injuries upon herself since only she and James were present at her residence—an absurd conclusion.

We hold that the portion of Officer Fletcher's testimony that Maggie "had just had the crap beat out of her" was admissible as a lay opinion under rule of evidence 701 and, therefore, that the trial court did not abuse its discretion by admitting this objected-to testimony.

To the extent James complains about the portion of Officer Fletcher's testimony opining that Maggie "needed immediate medical attention," James failed to preserve this issue for appellate review because he did not assert an objection to this testimony; instead, he stated that Officer Fletcher "can state that she thought she needed medical attention; I don't have a problem with that." *See*

8

Tex. R. App. P. 33.1(a); *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence.").

The dissent cites *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009), and disagrees that James failed to preserve this argument for appellate review. Dissenting and concurring op. at 6. But *Ford* is inapposite because it addresses the form an objection must take to preserve an issue concerning the admission of evidence for appellate review. In this case, instead of asserting an objection to Officer Fletcher's testimony that Maggie needed medical attention, James did the opposite: he affirmed that he did not object to that portion of Officer Fletcher's testimony. The dissent cites no case law—and would be hard pressed to find any—holding that an affirmative statement that a defendant *does not* object to the admission of evidence somehow simultaneously constitutes a preserved-for-appellate-review objection to that same evidence.

We overrule this part of James's first issue.

## B. Testimony about James's Self-Defense Assertion

In the second argument of his first issue, James contends that the trial court abused its discretion by permitting Officer Fletcher to opine on the truthfulness of James's assertion at the second disturbance call that he acted in self-defense. The relevant line of questioning proceeded as follows:

9

Q. And what else did he tell you about the -- the second incident that had happened?

. . . .

A. Oh. He basically told me that as soon as he got to the house, he got in there and she immediately began attacking him and -- and fighting with him.

Q. And did he tell you that he defended himself?

A. He said it was all self-defense.

Q. As someone who was standing there in that room with these people, what was your reaction to him telling you it was self-defense?

[Defense Counsel]: Objection, relevance.

[Prosecutor]: It's absolutely relevant, Judge. She was there. She's witnessing this. She's entitled to explain to the jury what she saw and if it made any sense to her.

[Defense Counsel]: How is her reaction relevant to it?

THE COURT: Sustained.

Q. (BY [Prosecutor]) *Ma'am, did the defendant's claim of self-defense make any sense to you based on what you saw?*

[Defense Counsel]: Objection, Your Honor. It's asking for an opinion and a conclusion based on things that apparently aren't in evidence at this time.

THE COURT: Overruled.

Q. (BY [Prosecutor]) Again, ma'am, did his claim of self-defense make any sense based on what you observed when you arrived at the house?

A. No, sir.

Q. Why not? Explain that to me.

10

A.    Because he had no new injuries on him and Maggie had a black eye, a cut nose, blood all over her face, bruises on her legs. And he did a heck of a job defending himself, if that was the case. [Emphasis added.]

The State argues that James's objection "was not specific enough to inform the trial judge of what he was complaining." Although James's objection was not a model of clarity, we conclude that it was sufficiently specific to inform the trial court that he objected to Officer Fletcher rendering an opinion as to the "sense" or validity of James's assertion at the second disturbance call that he acted in self-defense. *See* Tex. R. App. P. 33.1(a).

The authority that James cites does not support his argument that the trial court abused its discretion by permitting Officer Fletcher to answer the State's question inquiring whether James's assertion of self-defense at the second disturbance call made "any sense . . . based on what [she] saw." James cites *Black v. State* for the contention that "[a] witness is not allowed to give an opinion as to the truthfulness of witnesses or the truthfulness of a claim of self-defense." 634 S.W.2d 356, 357–58 (Tex. App.—Dallas 1982, no pet.). *Black* relied in part on the well-settled rule that a witness may not give an opinion as to whether another witness is telling the truth, *see Ayala v. State*, 171 Tex. Crim. 687, 689, 352 S.W.2d 955, 956 (Tex. Crim. App. 1962), in arriving at its holding that an expert's testimony concerning a complainant's propensity to tell the truth was inadmissible. *Black*, 634 S.W.2d at 357. Neither the holding in *Ayala* nor the holding in *Black* is applicable to this issue because Officer Fletcher did not offer

11

her opinion regarding the truthfulness of another witness's testimony, nor did she opine on Maggie's propensity to tell the truth. *Black* is, thus, inapposite.

James also cites *Taylor v. State* for the contention that "[a]n officer may not testify that he or she did not believe the explanation the defendant gave at the scene of the crime." 774 S.W.2d 31, 34 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). Taylor was convicted of burglary of a building. *Id.* at 32. At trial, the State questioned a police officer about whether he thought appellant's reason for being in the building (to get away from mosquitoes) was credible. *Id.* at 34. The officer responded that he did not think appellant's reason was credible. *Id.* The court of appeals concluded that Taylor's objection to the State's question should have been sustained because "[a]lthough the witness in the instant case did not testify as to [Taylor's] guilt, he did testify as to his opinion of [Taylor's] culpable mental state, which is an ultimate fact question for the jury's determination."[3] *Id.* As the State points out, however, testimony in the form of an opinion or inference otherwise admissible is not objectionable now because it embraces an ultimate issue to be decided by the trier of fact. *See* Tex. R. Evid. 704. Officer Fletcher also did not offer an opinion as to James's mental state. *Taylor* is, therefore, inapposite.

As with James's first argument, rule of evidence 701 governs this issue. The complained-of question specifically inquired about the *sense* of James's self-

---

[3]The *Taylor* court held that the error was harmless. *Taylor*, 774 S.W.2d at 34–35.

12

defense assertion in light of Officer Fletcher's observations. The State did not ask Officer Fletcher to opine on the truthfulness of another witness's testimony, to opine on the truthfulness of James's assertion of self-defense, to opine whether James was guilty, or to even opine on James's credibility, thus possibly encroaching upon the jury's province to make credibility determinations. Instead, the question inquired about the logical force of James's assertion in light of what Officer Fletcher had personally observed. Officer Fletcher responsively opined that the assertion did not make sense because she observed at the second call that James had no new injuries but Maggie—unlike at the first call—had a beaten, bloody, swollen face. The trial court could have reasonably concluded that Officer Fletcher's testimony—which was also relevant to show the contrast between Maggie's condition at the first disturbance call and her condition at the second call—was admissible under rule 701 because it was rationally based on events that she perceived, was relevant to whether James had assaulted Maggie, and did not expressly question James's or another witness's truthfulness or credibility. *See* Tex. R. Evid. 701. Therefore, we hold that the trial court did not abuse its discretion by permitting Officer Fletcher to so testify.

Even if the trial court abused its discretion by permitting Officer Fletcher to testify that James's assertion of self-defense made no sense to her, the error was harmless. Generally, the erroneous admission or exclusion of evidence is nonconstitutional error governed by rule 44.2(b) if the trial court's ruling merely offends the rules of evidence. *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex.

13

Crim. App. 2001). Under rule 44.2(b), we are to disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999); *Coggeshall v. State*, 961 S.W.2d 639, 642–43 (Tex. App.— Fort Worth 1998, pet. ref'd). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *Coggeshall*, 961 S.W.2d at 643. Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

We have reviewed the record as a whole. Notwithstanding the evidence of James's guilt, even in the absence of Officer Fletcher's complained-of testimony, the jury could have reasonably concluded—as it implicitly did by rejecting his

14

claim of self-defense—that James's assertion of self-defense made no sense based on other evidence admitted without objection. For example, Maggie testified that after James burst through the front door of her house, he told her, "[Y]ou bitch, I'm going to show you what real torture is all about; I'm going to do things to you that you can't even dream in your own nightmares." Maggie also testified that she spoke with James at some point after the incidents and that James wanted her to tell the police a different version of the facts—that she was elbowed when some kids from next door jumped him. Further, Ray Harder, a paramedic who responded to both the first and second calls at Maggie's residence, testified like Officer Fletcher that compared to the first visit, Maggie had "observable injuries the second time." Consequently, the admission of Officer Fletcher's testimony that James's assertion of self-defense did not make sense did not affect James's substantial rights; we have a fair assurance that the admission either did not influence the jury or that it had but a slight effect. *See* Tex. R. App. P. 44.2(b); *Motilla*, 78 S.W.3d at 355–57. Thus, assuming that the trial court abused its discretion, which it did not, the error, if any, was harmless.

## IV. MAGGIE'S ALLEGED PRIOR CONDUCT

In his second issue, James argues that the trial court abused its discretion by prohibiting him from questioning Maggie about a prior incident in which she allegedly attacked him when they lived at a different address. The following exchange occurred during James's cross-examination of Maggie:

Q. And did you and [James] ever live at any other address other than the Bolivar Street address?

A. 110 Owens.

Q. Owens Street? While you and Mr. James lived at the Owens Street address, do you recall whether or not Mr. James ever called the police out there?

[Prosecutor]: Your Honor, at this point in time, I'd object to the relevance of that.
May we approach, Your Honor?

THE COURT: You may.
(At the bench outside the hearing of the jury)

[Defense Counsel]: Your Honor, it's my understanding that the police went out to the Owens Street address and that Mr. James --

THE COURT: How is that relevant?

. . . .

[Defense Counsel]: It's my understanding that she attacked him with a box cutter and cut the bed up. She may deny it, but I think I have the right to ask her.

[Prosecutor]: I think it's a specific instance of conduct --

THE COURT: I sustain the objection.

James contends that "[t]his evidence was crucial for [his] contention that he acted in self-defense. . . . Without this testimony, [his] argument that he acted in self-defense was not believed by the jury."

Rule 404(b) provides for the admissibility of specific bad acts only to the extent that they are relevant for a purpose *other* than to show character conformity. Tex. R. Evid. 404(b). Because a complainant's unambiguous,

16

violent, or aggressive act needs no explaining, evidence of the complainant's extraneous conducted admitted in conjunction with his unambiguous act would have no relevance apart from its tendency to prove the victim's character conformity and, thus, would be inadmissible. *London v. State*, 325 S.W.3d 197, 205–06 (Tex. App.—Dallas 2008, pet. ref'd); *Mai v. State*, 189 S.W.3d 316, 321 (Tex. App.—Fort Worth 2006, pet. ref'd); *see Thompson v. State*, 659 S.W.2d 649, 653–54 (Tex. Crim. App. 1983) (reasoning that when complainant's conduct was ambiguously aggressive, prior, specific acts of violence were admissible so far as they tended to explain complainant's conduct). Therefore, two conditions must exist before a complainant's extraneous act will be admissible to support a claim of self-defense: (1) some ambiguous or uncertain evidence of a violent or aggressive act by the victim must exist that tends to show the victim was the first aggressor; and (2) the proffered evidence must tend to dispel the ambiguity or explain the victim's conduct. *Mai*, 189 S.W.3d at 321; *Reyna v. State*, 99 S.W.3d 344, 347 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing *Torres v. State*, 71 S.W.3d 758, 762 (Tex. Crim. App. 2002)).

James asserted that he acted in self-defense because Maggie attacked him when he returned to her house. Maggie's conduct is unambiguous. Consequently, neither the first nor second conditions above are met. *See Mai*, 189 S.W.3d at 321; *Reyna*, 99 S.W.3d at 347. The testimony that James sought to proffer from Maggie about a prior incident in which she allegedly attacked him does nothing more than show character conformity. The trial court did not abuse

17

its discretion by refusing to admit character evidence.  *See* Tex. R. Evid. 404(b).

We overrule James's second issue.

## V. Conclusion

Having overruled all of James's issues, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DAUPHINOT, J. filed a dissenting and concurring opinion.

PUBLISH

DELIVERED:  February 10, 2011



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00334-CR

OGDEN JAMES                                                    APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

## DISSENTING AND CONCURRING OPINION

----------

I write separately because I cannot agree with the majority that Officer Fletcher's opinion that Maggie "had just had the crap beat out of her" was properly admitted as "based on and derived from her cumulative personal knowledge."[1] The majority's statement that there is a "plethora," that is, an

---

[1]Majority op. at 6.

"extreme excess[,] '*an embarrassment*,'"[2] of "undisputed facts demonstrating that Officer Fletcher's responsive lay opinion was rationally based on events that she personally perceived during both visits to Maggie's residence"[3] is both confusing and, perhaps, a bit hyperbolic. I think the majority is suggesting that because they conclude that the evidence is sufficient to support conviction, we impute knowledge of all the evidence in the case to Officer Fletcher at the moment she decided to call for an ambulance. Respectfully, if we examine, without emotion, the evidence objectively known to Officer Fletcher at that moment, we see that

1. Officer Fletcher was not present when any assault occurred and could not, therefore, have had any personal knowledge of what occurred because it did not occur in her presence.

2. The first time Officer Fletcher arrived at the house in question, Appellant was standing outside, and Maggie was inside sitting on the couch or a chair, intoxicated and upset. Officer Fletcher thought that Maggie had been crying. Appellant said that Maggie was intoxicated and accusing him of sleeping with the girl who lived next door. Officer Fletcher detected alcohol on both Appellant and Maggie, but Maggie was the more intoxicated. Appellant was calm and had a couple of scratches on his face. Maggie's injuries were not apparent to Officer Fletcher until Maggie pointed them out. Officer Fletcher saw no severe injuries on either person. Although Maggie claimed that Appellant had choked her, Officer Fletcher observed nothing on Maggie's neck. Officer Fletcher saw a small cut on Maggie's leg and a small mark of a finger or thumb on one arm. It appeared to Officer Fletcher that both were aggressors. It appeared to be mutual combat, and both were at fault.

3. The second time that Officer Fletcher was called to the house, she first heard a sound like someone or something being thrown around inside the

---

[2]Plethora, http://dictionary.sensagent.com/plethora/en-en/ (last checked Jan. 28, 2011).

[3]Majority op. at 7.

2

house. She also heard yelling and screaming. She testified that she just had "that gut feeling that something [was] going to—something [was] not right." Maggie opened the door, and Appellant was right behind her. Officer Fletcher described Maggie's face as "covered in blood"; "her left eye was completely bruised and swollen shut"; she "had blood coming out her eye down her cheeks"; "she had a cut here"; and "some of her teeth were loose." Maggie was "bawling" and "holding her face." Officer Fletcher testified, "[Maggie] said something along the lines, he did this to me, you know. I told you—you know, I told you the first time. And, you know, she was just very upset."

Looking at the record objectively rather than emotionally, the "plethora of undisputed facts" regarding the cause of Maggie's black eye and bloody face being that "she had just had the crap beat out of her" by Appellant is that (1) Maggie was drunk and angry; (2) Officer Fletcher saw no one in the house other than Appellant and Maggie (although there is no evidence that Officer Fletcher searched the house); and (3) Maggie said, "[S]omething along the lines, he did this to me." Despite what the majority refers to as the "plethora of undisputed facts," we are still left with very little objective evidence to form the basis of Officer Fletcher's opinion of the cause of the injuries when she called for the ambulance.

The majority speculates that only two possible explanations for Maggie's injuries exist: either she harmed herself, or Appellant harmed her. Respectfully, the majority falls into the same trap as Officer Fletcher in leaping to a determination of credibility instead of relying on the record. Officer Fletcher heard sounds of someone or something "getting thrown around" inside the house, but she could not see what was happening. Did the mutual combat

3

continue, causing something to fall on Maggie?  Was she pushed into something that caused her injuries?  Was something thrown that hit her?  Did she fall against something in her intoxicated and angry state?  I do not know, the majority does not know, and Officer Fletcher did not know at the time she called for the ambulance.  She had no personal knowledge of what had caused Maggie's injuries.

The cause of Maggie's injuries was an element of the offense that the State was obligated to prove beyond a reasonable doubt.  Officer Fletcher's statement was nothing more than her personal opinion regarding that element of proof, but it was not based on her personal knowledge.  It was nothing more than a guess, based on what she "interpreted Maggie's statement" to mean, and her conclusion that someone she did not know was a truth-teller.  Moreover, her statement was not responsive to the question.  She was asked why she called for an ambulance, not what caused Maggie's injuries.

The majority relies on *Fairow v. State*[4] in holding that Officer Fletcher was allowed to offer a lay opinion based on her personal knowledge under rule 701.[5] But the *Fairow* court explained that

> [w]hen conducting a Rule 701 evaluation, the trial court must decide
> (1) whether the opinion is rationally based on perceptions of the witness
> and (2) whether it is helpful to a clear understanding of the witness's
> testimony or to determination of a fact in issue.  The initial requirement that

---

[4]943 S.W.2d 895 (Tex. Crim. App. 1997).

[5]*See* Tex. R. Evid. 701.

4

an opinion be rationally based on the perceptions of the witness is itself composed of two parts.  First, the witness must establish personal knowledge of the events from which his opinion is drawn and, second, the opinion drawn must be rationally based on that knowledge.[6]

Officer Fletcher, however, was not stating an opinion.  She was stating, as a fact, her guess.  She had no personal knowledge of the cause of Maggie's injuries, only speculation.  She did not state that she was expressing an opinion, but, rather, couched her guess as a fact.  And that fact was an essential element of the offense about which she had no personal knowledge.

Nor can I agree that Appellant did not object to the testimony.  The Texas Court of Criminal Appeals has explained that

> [t]o properly preserve an issue concerning the admission of evidence for appeal, "a party's objection must inform the trial court why or on what basis the otherwise admissible evidence should be excluded." However, a party need not spout "magic words" or recite a specific statute to make a valid objection.  References to a rule, statute, or specific case help to clarify an objection that might otherwise be obscure, but an objection is not defective merely because it does not cite a rule, statute, or specific case.  As this Court stated in *Lankston v. State*,
>
>> Straightforward communication in plain English will always suffice . . . .  (A)ll a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.
>
> The objection must merely be sufficiently clear to provide the trial judge and opposing counsel an opportunity to address and, if necessary, correct the purported error.  In making this determination,

---

[6]*Fairow*, 943 S.W.2d at 898 (citations and footnote omitted).

5

*Lankston* states that an appellate court should consider the context in which the complaint was made and the parties' understanding of the complaint at the time.[7]

Appellant's objection was precisely that Officer Fletcher was couching an opinion as a fact. Any trial judge would understand his objection: Officer Fletcher is offering a nonresponsive statement of fact when she was qualified only to admit that she was expressing an opinion that Maggie needed medical attention, not to state as a fact her guess as to the cause of the injuries when she was not asked what she guessed caused the injuries.

I do not understand the majority's statement that *Ford v. State* is inapposite. Officer Fletcher was qualified to testify that in her opinion, Maggie needed medical attention, Appellant conceded that Officer Fletcher was qualified to express that opinion and to make that determination on the occasion in question, and Appellant did not object to that testimony. However, Officer Fletcher was not qualified to state that she knew the cause of Maggie's injuries at the time she called the ambulance, Appellant did object to the statement that "[Maggie] had just had the crap beat out of her," and that objection was improperly overruled by a trial court who understood the objection. *Ford* is directly on point as authority that Appellant properly objected to the admission of Officer Fletcher's testimony about the causation of Maggie's injuries.

---

[7]*Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009) (citations omitted).

Maggie, however, testified at trial. She testified that Appellant had caused her injuries. The improper admission of Officer Fletcher's testimony was therefore harmless.[8] For this reason only, I concur in the majority's result. But I cannot agree that this court should give either the State or the defense the green light to offer such speculation under the guise of rule 701 lay opinion testimony. I therefore must respectfully dissent from this portion of the majority opinion.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: February 10, 2011

---

[8]*See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

7